## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

DAVID SCHOTT,

      Plaintiff,

v.

UNIVERSITY OF DENVER, a Colorado corporation,
VIVA MOFFAT, and
CESAR CUAUHTEMOC GARCIA HERNANDEZ,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff David Schott through his attorneys, Jester Gibson & Moore, LLP, for his complaint against Defendants the University of Denver, Viva Moffat, and Cesar Cuauhtemoc Garcia Hernandez, states and alleges as follows:

### INTRODUCTION

1.    This is a breach of contract, defamation, and employment discrimination case brought by a current trial advocacy professor and the Director of the Center for Trial Advocacy at the University of Denver's Sturm College of Law. In 2016, Professor Schott was told by the Associate Dean of Academic Affairs that she did not "want to see white men teaching anymore in the Center for Advocacy." Following these statements, and over the course of the next four years, Professor Schott was the target of a steady barrage of adverse actions and false statements that have damaged his reputation and violated the terms of his employment contract. Based on these

1

actions and statements, Schott asserts claims against DU under Colorado law for breach of contract, defamation, and violation of the Colorado Wage Claim Act, Colo. Rev. Stat. § 8-4-101 *et seq*. Professor Schott also asserts a claim against DU for sex-based employment discrimination and retaliation in violation of Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §1681 *et seq.* ("Title IX"). Finally, Professor Schott asserts Colorado state-law claims against defendant Cesar Cuauhtemoc Garcia Hernandez for defamation and against defendant Viva Moffat for tortious interference with contract.

## PARTIES

2.     Plaintiff David Schott ("Schott") is a Professor of the Practice at the University of Denver Sturm College of Law, Director of the law school's Center for Advocacy, and a citizen of Colorado.

3.     Defendant the University of Denver ("DU") is a private research university located in Denver, Colorado.

4.     At all relevant times, DU was the recipient of federal financial assistance and therefore subject to the requirements of Title IX, 20 U.S.C. § 1681 *et seq*.

5.     Defendant Viva Moffat ("Moffat") is a professor and the former Associate Dean of Academic Affairs at the University of Denver Sturm College of Law.

6.     Defendant Cesar Cuauhtemoc Garcia Hernandez ("Hernandez") is a former Associate Professor at the University of Denver Sturm College of Law.

## JURISDICTION AND VENUE

7.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1367.

8.     Schott asserts legal claims for discrimination and retaliation under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*

2

9.      Schott also asserts claims under Colorado state law that are so related to his Title IX claims that they form part of the same case or controversy. *See* 28 U.S.C. § 1367(a).

10.     Venue is proper in this court, because all the acts or omissions giving rise to Schott's claims occurred in the District of Colorado. 28 U.S.C. § 1391(b)(2).

## FACTS

### Schott's Employment at DU From 2005 to 2016

11.     In 1990, Schott received a Juris Doctorate degree, was admitted to the bar by the State of Illinois, and began a near-twenty-year career as a practicing attorney.

12.     In 1997 Schott relocated to Colorado and was admitted to the bar in this state. He has remained a member of the bar in good standing through the present.

13.     In 2005, Schott was hired by DU to serve as a part-time Adjunct Professor at DU's Sturm College of Law ("SCOL"), while he continued his private practice of law.

14.     In 2008, DU offered Schott, and he accepted, a five-year appointment to the position of full-time Lecturer at SCOL and inaugural Director of SCOL's Trial Advocacy Department, since renamed the Center for Advocacy ("CFA").

15.     Schott has excelled in his work for DU both as a faculty member and as the Director of the CFA. Schott's stellar performance is reflected in every formal review he has received during his employment and in the national recognition earned by the CFA under his directorship. For example, in 2012, the CFA was ranked 11th in the U.S. News and World Report rankings of law school trial advocacy programs. This was the first time SCOL's trial advocacy program had been ranked by that publication. In the years since, the CFA has continually ranked among the top trial advocacy programs in the country.

16.     Effective July 2013, DU promoted Schott to the title of Senior Lecturer and renewed his appointment for an additional five-year term, during which he continued in the role of Director of the CFA.

17.     In 2015, DU offered Schott an appointment as a full Professor of the Practice at SCOL, effective July 1, 2015. Schott accepted this appointment, under which he also continued as Director of the CFA.

18.     Schott continued to excel in his work for DU, with the CFA continuing to garner national recognition for excellence. Schott had (and still has) an unblemished employment record at DU, with consistently exceptional performance ratings. Schott has never been the subject of any disciplinary action.

**Moffat Expresses Bias Against White Men, Such as Schott**

19.     On July 1, 2016, Bruce Smith ("Smith") became Dean of SCOL.

20.     The following month, Schott had a one-on-one meeting with Moffat, who was the Associate Dean of Academic Affairs for SCOL. Moffat informed Schott that she did "not want to see white men teaching anymore in the Center for Advocacy." Rather, she wanted to only "see friendly faces, faces of minority women, preferably African-American women."

21.     Shortly after this conversation, Schott reported Moffat's statements to Smith.

22.     From this point forward during the Smith-Moffat administration, Schott felt pressure not to hire white men to teach for the CFA, even when they were the most qualified candidates.

23.     Also from this point forward, Schott – who is a white man teaching in the CFA – found himself on the receiving end of a series of unjustified adverse actions by the SCOL administration, largely orchestrated by Moffat, but with at least the tacit support of Smith.

**Moffat Makes Groundless Allegations of Gender Discrimination
Against Schott and the CFA**

24.     Shortly after Moffat made her comments about "white men" teaching in the CFA, she reported to Schott and Smith that she had received two reports of gender discrimination "involving the CFA." Upon information and belief, Moffat and/or Dean Smith then reported these allegations to DU's Office of Equal Opportunity and Title IX ("Title IX Office").

25.     The two allegations reported by Moffat were utterly unfounded. The first did not even "involve" the CFA, as Moffat claimed, but rather was an allegation that a female professor from a Texas law school, who had no affiliation whatsoever with DU, SCOL, or the CFA, used the word "bitchy" when speaking with four female students during a summer program in Scotland. The only connection with the CFA was that one of the students present was a participant in the CFA's programs.

26.     The other allegation was that a female student was asked, during her tryout for SCOL's National Trial Team, if she had discussed with the people close to her the time commitment required for participation on the team.

27.     The question asked of this student was asked of all National Trial Team candidates, regardless of gender. Hence, while this allegation at least involved the CFA, it did not involve any possible gender discrimination.

28.     Thus, none of the allegations were based on facts indicating that Schott or anyone else affiliated with the CFA had engaged in gender discrimination.

29.     Instead, Defendant Moffat made her unfounded allegations of gender discrimination against Schott based on his sex and with the intent of causing him an adverse employment action.

30.     Upon learning of the allegations, Schott denied engaging in gender discrimination or witnessing any of the CFA adjunct faculty engage in gender discrimination.

31.     In September 2016, Schott met with the then Director of the Title IX Office, Jean McAllister, who confirmed that the allegations conveyed by Smith and Moffat did not rise to the level of a Title IX violation by the CFA, Schott, or any CFA adjunct faculty members.

32.     On September 16, 2016, the Title IX Office terminated any further investigation into Moffat's allegations of gender discrimination due to their lack of merit.

33.     Under DU's published policies, the Title IX Office is the only body within DU with authority to investigate and adjudicate allegations of gender-based discrimination or harassment.

34.     Nevertheless, on or about December 21, 2016, Smith and Moffat presented Schott with a document entitled "Statement of Expectations," which set forth a list of five action items, or sanctions, that Schott and the CFA were required to carry out based on the unfounded allegations of gender discrimination.

35.     When it became apparent that SCOL was going to mandate remedial action despite the Title IX Office's dismissal of the complaint, Schott requested that DU conduct a formal investigation of the allegations, hold a hearing, and issue findings of fact, as required under its Title IX policies.

36.     Smith and Moffat summarily denied each of these requests and stated that, because DU was a private institution, it is not required to provide its faculty members with any due process.

37.     Although Smith and Moffat issued the "Statement of Expectations" without justification and in violation of DU's own policies, Schott, concerned about his job and the future of the CFA, worked with the Title IX Office to satisfy their mandates.

38.     During a meeting on January 25, 2017, the then acting Director of the Title IX Office, Eric Butler ("Butler"), confirmed that many of the sanctions mandated by Smith and Moffat had been improperly imposed on the CFA.

39.     Butler stated that the Title IX Office would complete some of the sanctions and work with the CFA to ensure completion of the rest. Butler further stated that he would notify Smith and Moffat when all five sanctions were completed.

40.     Between January 2017 and July 2017, Schott, the CFA adjunct faculty, and Butler collectively satisfied all five of the sanctions mandated by Smith and Moffat in their "Statement of Expectations."

41.     During this period, Butler complimented Schott and the CFA for their success assimilating students of all genders, races, and backgrounds and even asked Schott's permission to use some of the programming he had implemented with other DU departments.

42.     From approximately July 2017 to April 2019, there was no further mention to Schott, by Smith, Moffat, or any other University official, of the sanctions imposed by Smith and Moffat in their "Statement of Expectations" or the unfounded allegations which precipitated them. However, as will be discussed following the next section, DU later relied on the same unfounded allegations to frustrate and delay renewal of Schott's faculty appointment.

43.     Moffat's unfounded allegations of gender discrimination have harmed Schott's reputation and reduced his standing within SCOL and the broader legal community. Since Moffat first asserted her allegations against him, Schott has been approached by at least two SCOL alumni, who have reported hearing that Schott was being sued for gender discrimination. On one such occasion, the alumnus indicated it was "common knowledge" along the I-25 corridor in Colorado that Schott was being sued for discrimination.

7

**DU's Refusal to Pay Schott Earned Compensation**

44.     Under the terms of Schott's appointments as Lecturer and Senior Lecturer, he was entitled to an annual base salary for performing the duties of a Lecturer, plus an annual stipend for serving as Director of the CFA.

45.     At SCOL, the normal teaching load for full-time faculty is twelve credit hours per year. Courses taught in excess of that amount are referred to as "overload courses."

46.     Because the CFA was a new program, SCOL had not yet hired a full complement of faculty to teach in it. To address this gap, SCOL administrators asked Schott to teach a substantial number of overload courses in exchange for additional compensation, to which Schott agreed.

47.     Upon information and belief, the University and SCOL began experiencing financial difficulties in or around 2012.

48.     Early in 2012, the SCOL administration asked Schott if, going forward, he would agree to DU compensating him for some of the overload courses he taught with Credit Hour Equivalents ("CHEs"), rather than additional pay. Then Associate Dean of Academic Affairs, Fred Cheever ("Cheever"), explained that 12 CHEs would be the equivalent of one year's teaching load, and that Plaintiff would be allowed to use 12 CHEs in a single academic year to be relieved of all teaching duties for that year while still receiving his full annual compensation. However, Cheever and the then Dean of SCOL asked Schott to wait "a few years" before using his CHEs to take a year-long hiatus from teaching, in light of SCOL's financial circumstances.

49.     On these terms, Schott agreed that SCOL could convert a portion of his monetary compensation for teaching overload courses into CHEs.

50.     During the period from 2012 through 2014, Schott accumulated twelve CHEs teaching overload courses at the request of SCOL. This is exclusive of those overload courses for which he received financial compensation.

51.     After waiting a few years, as agreed, Schott requested to use these accumulated CHEs.

52.     In or around August 2018, and despite knowing of Schott's agreement with the prior SCOL administration regarding the accumulation and use of CHEs, Moffat informed Schott that SCOL would not recognize the CHEs he had earned between 2012 and 2014. Moffat informed Schott that any request by him to use CHEs to reduce or eliminate his course load, or to receive monetary compensation in lieu of the CHEs, would be denied.

### Moffat Interferes with the Renewal of Schott's Contract

53.     Pursuant to the written terms of his 2015 appointment as a Professor of the Practice, as set forth in an April 28, 2015 "Offer Letter," Schott was to undergo a reappointment review during the 2017-2018 academic year. The Offer Letter further provided that Schott would be notified of the results of that review by April 1, 2018.

54.     The Offer Letter further provided that, if Schott successfully completed this review, he would receive a new appointment for a seven-year term.

55.     The Offer Letter expressly incorporated DU's "Policies and Procedures Relating to Appointments, Promotions, and Tenure" ("APT Rules").

56.     The APT Rules expressly contemplate and provide that "[c]olleges, schools, division, departments, and centers [may] develop written guidelines to supplement the philosophies, policies, and procedures for appointment, reappointment, promotion, tenure, and termination" set forth in the APT Rules.

57.     Sections 1.3 and 7.3.6 of the APT Rules further incorporate DU's Equal Opportunity policies and, specifically, DU's procedures for reviewing complaints of discrimination and harassment, including alleged Title IX violations.

58.     On December 7, 2015, SCOL supplemented the APT Rules with "Rules for Appointment and Review of Long-Term Contract with Governance Rights (LTCGR) Faculty" ("LTCGR Rules").

59.     The LTCGR Rules provide that a faculty member in Schott's position is "entitled to a presumption favoring renewal of the appointment at the same rank. The presumption favoring renewal means that a renewal will be awarded absent a showing that the candidate no longer satisfies renewal requirements."

60.     The LTCGR Rules provide that "[r]ecommendations for reappointment and promotion shall be based on demonstrated excellence and continuing potential for excellence in teaching," and set forth detailed factors for determining whether this criteria has been satisfied. The LTCGR Rules further provide that "professional service shall be considered," and that "[s]cholarship may also be considered if and to the extent that scholarship is a component of the candidate's responsibilities." Scholarship is not a component of Schott's responsibilities.

61.     No other requirements for reappointment are set forth in the LTCGR or APT Rules.

62.     The LTCGR Rules also provide that the Dean of SCOL can exercise discretion to extend the time for notice and review for renewal by up to one year if "the extension is warranted by administrative burdens, the candidate's best interests, or the College of Law's best interests."

63.     Therefore, under the terms of Schott's employment contract, as supplemented by the APT and LTCGR Rules, Schott was entitled to (a) a reappointment review no later than the 2018-2019 academic year; (b) notice of the results of that review no later than April 1, 2019; and

(c) reappointment under a seven-year contract beginning July 1, 2019, absent a showing that he did not satisfy established renewal requirements.

64.     Dean Smith initiated Schott's reappointment review in August 2018, apparently exercising his discretion to delay the review by one year, beyond what was specified in the Offer Letter.

65.     Pursuant to SCOL policy, reappointment reviews are conducted by a Faculty Review Committee, which is tasked with recommending to the dean, at the conclusion of such a review, whether to renew the appointment of the faculty member up for renewal.

66.     Moffat reported to the Faculty Review Committee appointed for the 2018-19 academic year ("FRC1") that over the course of five years she had received complaints and concerns that the CFA and Schott discriminated against female students by:

    a.  Judges and coaches in the program providing feedback to female students indicating that they sounded "bitchy."

    b.  Asking female students questions about their personal relationships or relationship status.

    c.  Asking a female student who was trying out for the trial team whether her husband approved of her participation on the team.

    d.  One female student indicated that she felt she "was forced to choose either trial team or [her] academic/legal future."

67.     All of the foregoing allegations are false. Moffat knew allegations (a) and (c) were false because they were the subject of her 2016 complaint to the Title IX Office, which was dismissed on September 16, 2016. Moreover, when Moffat initially made allegation (a) in August 2016, she acknowledged that the alleged comment was made by a female professor from a Texas

law school during a summer program overseas, not by any "judges or coaches" in the CFA. To this day Schott does not know the source (if any) of allegations (b) and (d), but, upon information and belief, Moffat either knew they were false or acted with reckless disregard of their truthfulness.

68.     Moffat also provided the "Statement of Expectations" to FRC1 and falsely conveyed that it was imposed to remediate conduct which violated Title IX.

69.     In April 2019, Dean Smith encouraged Schott to delay his reappointment review for a year, in light of FRC1's concerns regarding the information it had received from Moffat, and in particular the "Statement of Expectations."

70.     Schott objected to the proposed delay, reiterating that there had never been "any credible allegations of misconduct against [him], the [CFA], or the attorneys and judges associated with the CFA," and that all of the sanctions imposed by Smith and Moffat had been completed by "mid-2017 under the supervision and guidance of the University's Title IX Office."

71.     Schott also wrote a letter directly to FRC1 in which he stated that there had never been any finding of impropriety on the part Schott or the CFA, and that all of the tasks set forth in the "Statement of Expectations" were completed by mid-2017 under the supervision of the Title IX Office.

72.     In July 2019, after the deadline for a decision on renewal had passed, Schott received notice from Smith that FRC1 had asked him to exercise his "decanal discretion to delay the review one year" because of the "[c]oncerns regarding Title IX and other genderist issues" raised by Moffat.

73.     Sometime thereafter, Smith purported to exercise his decanal discretion to delay Schott's reappointment review by a single year, when, in fact, this caused Schott's review to be delayed by a second year beyond what was specified in his Offer Letter.

74.     In October 2019, the chair of the Faculty Review Committee appointed for the 2019-2020 academic year ("FRC2") informed Schott that it would be reviewing him for renewal.

75.     At least one faculty member appointed to FRC2 also had served on FRC1. As a result, from the outset of its review, the members of FRC2 were aware of Moffat's false allegations of Title IX violations and the related "Statement of Expectations."

76.     On or about March 25, 2020, defendant Hernandez took over as acting chairperson of FRC2. Five days later, he emailed Schott stating that FRC2 was "not equipped" to recommend renewal of Schott's teaching appointment.

77.     The reason FRC2 concluded it was "not equipped" to recommend renewal was that it was not able to determine whether Schott had violated Title IX or satisfied the remediation plan improperly imposed by Smith and Moffat, purportedly in response to Title IX concerns.

78.     In a letter to Hernandez and several other individuals, Schott expressed confusion at FRC2's inability to recommend renewal of his teaching appointment and reiterated that "there ha[d] never been any finding, *whatsoever*, by the University's Title IX Office . . . that any improper conduct was engaged in by [Schott] or any member of the [CFA] teaching faculty."

**Hernandez Republishes Moffat's False Allegations to the Entire SCOL Faculty**

79.     On or about June 4, 2020, FRC2 sent Schott its "Draft Report." That report concluded that Schott met the requirements of excellence in teaching and sufficient service to the university to merit reappointment. Under DU's APT and LTCGR Rules, which were incorporated into Schott's employment contract, these findings entitled him to reappointment by the dean to a seven-year term.

80.     Nothing in any of DU policies gives Faculty Review Committees any jurisdiction to investigate or consider allegations that an applicant for reappointment has engaged in conduct

violating Title IX. Nonetheless, the FRC2 included in its Draft Report a section entitled "Title IX Considerations." FRC2 stated it in that section it was "aware that Schott's conduct had[d] raised concerns about possible discrimination toward students and colleagues," and repeated Moffat's baseless allegations of gender discrimination against Schott and the CFA. FRC2 also stated that it had received reports of "gendered" treatment by Schott from two female colleagues.

81.     The Draft Report discussed Smith and Moffat's "Statement of Expectations" and noted that FRC2 "continue[d] to lack information regarding what, if any, requirements identified in the December 2016 Statement of Expectations or January 2017 Plan of Action ha[d] been completed."

82.     At the time the Draft Report was issued, FRC2 knew, or recklessly disregarded the fact, that the allegations contained in the section "Title IX Considerations" were false. As reflected in the Draft Report, DU's Title IX Coordinator, Jeremy Enlow, had already informed FRC2 that "any prior concerns brought to [the Title IX Office] ha[d] been resolved and the matter closed."

83.     Further, upon information and belief, Eric Butler had notified Smith and Moffat, in July 2017, that Schott and the CFA had completed all sanctions imposed in the "Statement of Expectations." Schott also provided FRC1 with additional information regarding his completion of the sanctions on or about February 12, 2019.

84.     The allegations regarding Schott's purportedly "gendered" treatment of two female colleagues were also false, and neither Schott nor the Title IX Office was informed of the allegations prior to the issuance of the Draft Report.

85.     In response to the Draft Report, Schott reminded FRC2 that there had never been any credible claim he had violated DU's policies related to Title IX or equal opportunity, nor any finding to that effect. Schott reiterated that the only faculty member he was aware of who had

described a student's manner as "bitchy" taught at a foreign university and was not affiliated with DU, SCOL, or the CFA in any way.

86.     In his communication to FRC2, Schott emphasized that not only were the allegations of gender bias set forth in the Draft Report false, but their publication would cause substantial damage to his reputation. Schott demanded that FRC2 not publish the section of its Draft Report entitled "Title IX Considerations," any other references to those "considerations," and the paragraphs entitled "Faculty Colleague 3" and "Faculty Colleague 4," on the basis that those sections were false and defamatory.

87.     On June 19, 2020, Hernandez published, over Schott's objections, FRC2's full report, including these false and defamatory allegations, to the entire SCOL faculty.

88.     Upon information and belief, Hernandez's publication of the false and defamatory allegations to the SCOL faculty have caused Schott reputational harm and reduced his standing within SCOL and the broader legal community.

### Schott Complains to DU and the Title IX Office, and DU Refuses to Reappoint Him

89.     Between 2019 and 2020, Schott complained to DU on at least two occasions that the various adverse actions taken against him constituted discrimination on the basis of gender.

90.     For example, on November 15, 2019, Schott, through counsel, sent a letter to Smith and DU's General Counsel in which he complained of the adverse and hostile working conditions to which he had been subjected on account of his race and gender.

91.     On July 3, 2020, Schott also filed a complaint of gender discrimination with DU's Interim Executive Director of Equal Opportunity and Title IX Coordinator, Jeremy Enlow, in which Schott reiterated the false and defamatory nature of the allegations published in FRC2's final report and noted that the publication of the report was but one act in "a continuum of adverse

statements and actions exacted upon [him] . . ., starting with Viva Moffat's directive in August 2016" that she did not want white men teaching anymore in the CFA.

92.     Enlow had previously told Schott that there was no merit to Moffat's allegations and that neither Moffat nor Smith had the authority to conduct a Title IX investigation or impose any of the sanctions set forth in their "Statement of Expectations," as only the Title IX Office had that authority.

93.     Upon information and belief, and based on past representations by Enlow that he would speak with Smith regarding Schott's Title IX concerns, Enlow informed Smith of Schott's July 3, 2020 complaint.

94.     DU has never responded to Schott's July 3, 2020 complaint.

95.     To Schott's knowledge, DU has also taken no steps to investigate or remedy the concerns raised in his November 2019 and July 2020 complaints of discrimination, despite the fact that Enlow previously indicated a formal investigation into Schott's concerns was warranted.

96.     Despite FRC2's finding that Schott has satisfied the requirements for renewal under DU's governing policies, DU has yet to renew Schott's teaching appointment.

97.     Upon information and belief, DU has not renewed Schott's teaching appointment because of Moffat's unfounded allegations of gender discrimination against Schott and/or Schott's November 15, 2019 and July 3, 2020 complaints regarding the adverse statements and actions taken against him because of his gender.

### DU's Treatment of Schott Violates its Own Title IX Policies and Procedures

98.     At all relevant times, DU's Office of Equal Opportunity and Title IX Procedures ("Title IX Procedures") mandated that all reports of possible violations of the university's equal opportunity policies be referred to the Title IX Office for an initial assessment resulting in one of

16

three outcomes: (a) an early inquiry/resolution by the Title IX Office; (b) a referral for an alternative resolution; or (c) the initiation of a formal investigation.

99.     Under the Title IX Procedures, only the Title IX office has authority to investigate and adjudicate whether an employee of DU has violated the University's Title IX policies. A university official outside of the Title IX Office has authority to take disciplinary action against an employee in response to allegations of sex-based discrimination or harassment only upon a determination by the Title IX Office that the employee has violated the university's Title IX policies.

100.     The Title IX Procedures afford certain (albeit limited) procedural rights to those accused of misconduct. For example, individuals accused of misconduct have a right to be notified of the allegations against them, be heard in connection with those allegations, and appeal a finding before it becomes final and can support any disciplinary action.

101.     The Title IX policies also protect the privacy of the accused, to the extent possible, at least until a finding of guilt has been made by the Title IX Office.

102.     The Title IX Office has made no finding that Schott engaged in any conduct violating DU's Title IX policies.

103.     Accordingly, DU, through its agents Moffat, Hernandez, and Smith violated DU's Title IX Procedures by, *inter alia*: (a) unilaterally imposing upon Schott and the CFA the various sanctions set forth in the December 2016 "Statement of Expectations"; (b) relying on the allegations, which had been dismissed by DU's Title IX Office, to delay indefinitely Schott's reappointment as Professor of the Practice; (c) failing to provide Schott with notice of all of the allegations against him and an opportunity to be heard, before taking adverse action against him based on those allegations; and (d) publishing those allegations to the entire SCOL faculty.

104.     DU has further violated its Title IX Procedures by failing to conduct any inquiry or investigation into Schott's various complaints, including his November 15, 2019 letter to Smith and DU's General Counsel and his July 3, 2020 complaint to DU's Title IX Office, regarding the series of adverse actions to which Schott has been subjected over the past four years.

## STATEMENT OF CLAIMS

### First Claim for Relief: Breach of Contract
### (Against DU for Denial of CHEs)

105.     The foregoing allegations are realleged and incorporated herein by reference.

106.     Schott had a verbal contract with DU, under which Schott agreed to teach a certain number of overload courses in exchange for compensation in the form of CHEs.

107.     Schott performed his obligations under the contract by teaching overload courses for no or reduced monetary compensation.

108.     In or around August 2018, DU breached its contract with Schott, or demonstrated a clear and definite intention not to perform under the contract, when Moffat informed Schott, in her capacity as Associate Dean, that Schott was not entitled to compensation for the 12 CHEs he had accumulated, and that any requests for such compensation would be denied.

### Second Claim for Relief: Promissory Estoppel
### (Against DU, as Alternative to First Claim for Relief)

109.     The foregoing allegations are realleged and incorporated herein by reference.

110.     Associate Dean Cheever, on behalf of and as an agent of DU, promised that Schott would be entitled to accumulate CHEs in exchange for teaching overload courses without monetary compensation.

111.    Associate Dean Cheever further promised that Schott would be entitled to use 12 CHEs in a single academic year to be relieved of all teaching responsibilities for that year while still receiving his full annual base compensation.

112.    DU should reasonably have expected that these promises would induce action or forbearance by Schott.

113.    Schott detrimentally relied on DU's promises by agreeing to teach a certain number of overload courses for no or insufficient monetary compensation.

114.    DU has refused to honor its promise to Schott.

115.    DU's promises to Schott must be enforced to prevent injustice.

### Third Claim for Relief: Violation of the Colorado Wage Claim Act
### (Against DU)

116.    The foregoing allegations are realleged and incorporated herein by reference.

117.    By failing to pay Schott the full monetary compensation to which he was entitled for teaching overload courses during the period from 2012 to 2014 and subsequently denying Schott the value of the CHEs he accepted in lieu of monetary compensation for teaching overload courses during the same time period, DU did not pay Schott all wages or compensation due and owing to him, in violation of Colo. Rev. Stat. § 8-4-103(1)(a).

118.    DU's violation of the Colorado Wage Claim Act was willful.

119.    As a result of DU's violation, Schott has suffered damages.

### Fourth Claim for Relief: Breach of Contract
### (Against DU Based on its Failure to Timely Renew Schott's Appointment)

120.    The foregoing allegations are realleged and incorporated herein by reference.

121.    In 2015, Schott entered into a contract with DU to serve as Professor of the Practice at SCOL.

122.    Schott performed all of his obligations under the contract.

123.    DU breached its contract with Schott by failing to (a) complete his reappointment review during the 2018-2019 academic year; (b) notify Schott of the results of that review by April 1, 2019; and (c) renew Schott's appointment under a seven-year contract by the start of the 2019-2020 academic year.

**Fifth Claim for Relief: Breach of Contract**
**(Against DU Based on its Failure to Follow Title IX Policies)**

124.    The foregoing allegations are realleged and incorporated herein by reference.

125.    Schott had an employment contract with DU that expressly incorporated, through the APT Rules, DU's Title IX policies and procedures.

126.    As set forth above, DU has violated its Title IX procedures in several respects related to Schott and to his disadvantage.

127.    In violating its Title IX Procedures, DU breached its contract with Schott.

**Sixth Claim for Relief: Defamation Per Se**
**(Against Hernandez and DU)**

128.    The foregoing allegations are realleged and incorporated herein by reference.

129.    On June 19, 2020, defendant Hernandez published to multiple third parties false and injurious statements that Schott had acted in a discriminatory or biased manner toward students and faculty members on the basis of gender.

130.    At the time Hernandez published the false and injurious statements concerning Schott, Hernandez was acting within the scope of his employment as Associate Professor at SCOL and Chairman of FRC2.

131.    The statements published by Hernandez were false, were injurious on their face, and pertained to a matter incompatible with Schott's profession as an attorney and law professor. As such, the statements were libelous per se.

132.    Hernandez published the statements knowing they were false, or with reckless disregard as to their falsity.

133.    By publishing the false and defamatory statements, Hernandez and DU caused Schott actual damages in the form of reputational harm, personal humiliation, and mental anguish.

**Seventh Claim for Relief: Tortious Interference with Contract**
**(Against Moffat)**

134.    The foregoing allegations are realleged and incorporated herein by reference.

135.    Schott had an employment contract with DU, under which he was entitled to renewal of his reappointment no later than the beginning of the 2019-2020 academic year.

136.    Upon information and belief, and based on her position as Associate Dean of Academic Affairs, Moffat knew or reasonably should have known of Schott's employment contract with DU.

137.    Moffat caused DU not to perform under the contract, or interfered with DU's performance of the contract, by asserting false and defamatory allegations that Schott had engaged in gender discrimination.

138.    Specifically, Moffat's allegations interfered with DU's performance of the contract by directly and proximately causing Smith to delay Schott's review and reappointment as Professor of the Practice, in violation of his employment contract.

139.    At all relevant times, Moffat knew that her allegations of gender discrimination against Schott were false, or acted with reckless disregard as to their falsity.

140.     Moffat asserted her false and defamatory allegations against Schott either for the purpose of interfering with DU's performance of Schott's employment contract or knowing that such interference was substantially certain to result.

141.     Moffat's interference with Schott's employment contract was improper and motivated solely by a desire to harm Schott, as evidenced by the fact that Moffat knew her allegations of gender discrimination were false, acted in violation of DU's Title IX Procedures, and harbored personal animus toward Schott based on his race and gender.

142.     Through her actions, Moffat has caused Schott damages, including but not limited to reputational harm and emotional distress.

**Eighth Claim for Relief: Sex Discrimination in Violation of Title IX**
**(Against DU)**

143.     The foregoing allegations are realleged and incorporated herein by reference.

144.     DU discriminated against Schott on the basis of sex when it breached its agreement to renew Schott's appointment by the start of the 2019-2020 academic year on the basis of Moffat's false and defamatory allegations of gender discrimination and subjected Schott to other less favorable terms and conditions of employment, including by failing to follow applicable Title IX Procedures with respect to the allegations asserted against Schott, and failing to conduct any inquiry or investigation into Schott's November 15, 2019 and July 3, 2020 complaints of discrimination.

145.     DU's actions were intentional and motivated by Schott's sex.

146.     In addition, DU acted with malice or reckless indifference to Schott's federally protected rights under Title IX.

### Ninth Claim for Relief: Retaliation in Violation of Title IX
### (Against DU)

147.    The foregoing allegations are realleged and incorporated herein by reference.

148.    Schott made good faith complaints to Smith, DU's General Counsel, and DU's Title IX Office about sex discrimination unlawful under Title IX.

149.    Because of Schott's complaints about sex discrimination, DU retaliated against Schott by subjecting him to different terms and conditions of employment, such as by failing to reappoint him to a seven-year term, even though such reappointment was mandated by DU's policies and its contract with Schott.

150.    In retaliating against Schott, DU acted intentionally and with malice or reckless indifference to Schott's federally protected rights under Title IX.

### Tenth Claim for Relief: Declaratory Judgment under Colo. Rev. Stat. § 13-51-101 *et seq.*
### and Colo. R. Civ. P. 57
### (Against DU)

151.    The foregoing allegations are realleged and incorporated herein by reference.

152.    Schott had a written contract with DU, under which he was entitled to a reappointment review during the 2018-2019 academic year, notification of the results of that review by April 1, 2019, and renewal of his teaching appointment under a seven-year contract by the start of the 2019-2020 academic year.

153.    Schott also had a verbal contract with DU, under which he was entitled to CHEs in exchange for teaching overload courses.

154.    Schott is an interested person under these contracts pursuant to Colo. R. Civ. P. 57(b).

155.    DU has breached these contracts and/or denied that Schott has any rights or entitlements thereunder, as set forth in this complaint.

156.    Schott seeks a declaration of the parties' rights and obligations under the contracts.

## JURY DEMAND

157.    Schott seeks a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Wherefore, Schott respectfully prays for an Award in his favor for:

A.    Economic damages for unpaid wages and breach of contract;

B.    Non-economic damages for reputational harm, inconvenience, mental anguish, and emotional distress;

C.    Punitive damages;

D.    Nominal damages;

E.    Declaratory and/or injunctive relief;

F.    Attorney's fees and costs;

G.    Pre- and post-judgment interest;

H.    Any further relief the Court deems just and proper.

Respectfully submitted this 16th day of June 2021.


JESTER GIBSON & MOORE, LLP


   s/ Denison Goodrich-Schlenker
Denison Goodrich-Schlenker
Brian T. Moore
1999 Broadway, Suite 3225
Denver, CO  80202
(303) 377-7888
dgoodrich@jgllp.com
bmoore@jgllp.com
ATTORNEYS FOR PLAINTIFF