**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Senior Judge Christine M. Arguello**

Civil Action No. 21-cv-01645-CMA-STV

DAVID SCHOTT,

      Plaintiff,

v.

UNIVERSITY OF DENVER,
VIVA MOFFAT, and
CESAR CUAUHTEMOC GARCIA HERNANDEZ,

      Defendants.

---

**ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

This matter is before the Court on Defendants University of Denver ("DU"), Viva Moffat, and César Cuauhtémoc Garcia Hernández's (collectively "Defendants") Motion for Summary Judgment. (Doc. # 68.) For the following reasons, the Motion is granted as it relates to Plaintiff David Schott's federal law claims, and the remainder of Mr. Schott's claims—all of which arise under state law—are dismissed without prejudice for lack of jurisdiction.

## I.      __BACKGROUND__[1]

This is an employment case arising from DU Strum College of Law's ("SCOL") alleged mishandling of Title IX allegations against Mr. Schott and decision to not renew

---

[1] Unless otherwise indicated, the following material facts are undisputed. (Doc. # 68 at 3–21; Doc. # 74 at 1–15; Doc. # 79 at 2–7.)

his long-term contract. Mr. Schott is a professor of the Practice of Law and Director of SCOL's trial advocacy program, the Center for Advocacy ("CFA"). (Doc. # 68-1 at 1–7.)[2] Mr. Schott began his employment with SCOL in 2008 and over the last fifteen years has built the CFA into the sixth ranked trial advocacy program nationally. (Doc. # 74-19 at 1; Doc. # 75-26 at 1.) In 2013, in recognition of consistently high scores on his teaching evaluations, as well as "wildly enthusiastic praise for his teaching and sincerely appreciative feedback from his students," a faculty review committee unanimously recommended that Mr. Schott be promoted to Senior Lecturer and awarded a long-term contract. (Doc. # 74-20 at 5–6, 12–13, 16; Doc. # 74-21 at 1.)

## A. POLICIES AND PROCEDURES APPLICABLE TO MR. SCHOTT'S EMPLOYMENT

As of 2015, when DU implemented university-wide Policies and Procedures Relating to Faculty Appointment, Promotion, & Tenure ("APT") (Doc. # 74-3), Mr. Schott's contract was governed by the APT as well as by the SCOL's Rules for Appointment and Review of Long-Term Contract with Governance Rights ("LTCGR") Faculty (Doc. # 68-8). (Doc. # 74-2 at 1; Doc. # 74-4 at 3–4.) The APT contains substantial protections against involuntary termination during a contract term. (Doc. # 74-3 at 45–54.) It also expressly encourages "Colleges, schools, divisions, departments, and centers . . . to develop written guidelines to supplement the philosophies, policies, and procedures for appointment, reappointment, promotions, tenure, and termination in

---

[2] The Court cites to the docket number (*e.g.*, Doc. # 68-1) and the page number applied by the court docketing system in blue in the header of each document (*e.g.*, Doc. # 68-1 at 1).

the present document," but notes that "if conflicts arise, . . . policies and procedures in the present document prevail." (Doc. # 74-3 at 5; Doc. # 74-4 at 7.)

Pursuant to these documents, during the next to last year of his contract, a faculty review committee ("FRC") would consider Mr. Schott's reappointment to a seven-year contract. (Doc. # 74-3 at 23; Doc. # 74-4 at 5.) The committee is charged with summarizing its review in a written report and recommending "a. Termination upon completion of the appointment; b. Renewal of the appointment; c. Promotion to the next rank; or d. Other appropriate action, including, but not limited to, a one-year terminal contract." (Doc. # 68-8 at 2.) The report is made available to "tenured, tenure-track and LTCGR faculty for review and comment" before it is submitted to the Dean of SCOL.[3] (*Id.* at 2.) The Dean ultimately decides whether to terminate or renew the appointment, or "tak[e] other appropriate action." (*Id.* at 2–3.)

Under the LTCGR Rules, as a full professor, Mr. Schott was "entitled to a presumption favoring renewal of [his] appointment at the same rank[, meaning] that a renewal will be awarded absent a showing that the candidate no longer satisfies renewal requirements." (*Id.* at 3.) However, the LTCGR Rules specify that "[n]othing in this document shall be construed to confer any guarantee of contract renewal,

---

[3] Mr. Schott asserts that "[t]he APT required reappointment reviews to remain confidential, to the point that not even the candidate was entitled to a copy of the report." (Doc. # 74 at 11 (citing Doc. # 74-3 at 23, 34.)) However, the Court finds no direct conflict between the APT's confidentiality provisions and the LTCGR's procedure for disseminating its report to faculty and the Dean. The APT provides for the strict confidentiality of review committees' votes, deliberations, and statements made by external reviewers. (Doc. # 74-3 at 34.) Although the APT also states that a committee's "recommendation (but not the report) shall be communicated to the candidate in writing," (*id.*) it does not expressly provide for the confidentiality of the committee's report.

entitlement to tenure, or long-term job security equivalent to tenure." (*Id.* at 6.) The Dean may also "extend the time for notice and review up to one year if in the Dean's discretion the extension is warranted by administrative burdens, the candidate's best interests, or the College of Law's best interests." (*Id.* at 3.)

Finally, all DU employees are subject to the university's Equal Opportunity and Title IX ("EOIX") policies and procedures (Doc. # 68-4 (2019–2020); (Doc. # 75-2 (2016–2017)) which, amongst other things, govern DU's responsibilities and procedures related to non-discrimination and harassment on the basis of race and gender. (Doc. # 68-4 at 3–4; Doc. # 75-2 at 4–5) *see also* (Doc. # 74-3 at 7; Doc. # 74-5 at 3.) Both the 2016–2017 and 2019–2020 policies list discrimination as one of multiple types of Prohibited Conduct. (Doc. # 68-4 at 10–14; Doc. # 75-2 at 8–18.) The 2019–2020 EOIX procedures define discrimination as "an action or behavior that results in impermissible negative or different treatment of an individual based, in whole or in part, upon the person's race, … sex, . . . gender identity, [or] gender expression. (Doc. # 68-4 at 10.) According to former Title IX Coordinator Jeremy Enlow, "one-off comment[s] without any type of action or behavior being taken" do not constitute discrimination under this policy. (Doc. # 68-17 at 3–4.)

Upon the receipt of a report of alleged Prohibited Conduct, the EOIX procedures outline various steps and options for resolution. (Doc. # 68-4 at 21–31; Doc. # 75-2 at 23–33.) Following a report, the University may

> 1) determine that the reported concern does not meet the criteria for a possible violation of University Policy (this determination may result in a referral to another University department or resource or result in no

action taken); 2) seek an Alternative Resolution; or, 3) initiate an investigation to determine if the conduct resulted in a policy violation."

(Doc. # 75-2 at 24); *see also* (Doc. # 68-4 at 23.) A complainant's interests and "expressed preference for manner of resolution" may be considered, "[w]here appropriate." (Doc. # 68-4 at 21); *see also* (Doc. # 75-2 at 23.)

Under the 2016–2017 procedures, "Disciplinary Action"—"action levied by the University against an employee found responsible for Prohibited Conduct"—can only be imposed following a formal investigation and finding that the employee engaged in Prohibited Conduct. (Doc. # 68-4 at 8, 29; Doc. # 74-6 at 3; Doc. # 74-36 at 3; Doc. # 75-2 at 24.) Although various parts of the university may be involved in a response to a report of prohibited conduct, only the EOIX Office can determine if someone had violated the Title IX policies. (Doc. # 74-36 at 3.) No formal investigation or finding is required for a report to result in "alternative resolutions" defined as "a remedy-based approached designed to address a report by a Complainant." (Doc. # 68-4 at 24; Doc. # 75-2 at 28.) The 2016–2017 procedures note that "[f]or employee Respondents, alternative resolutions may yield corrective actions" (Doc. # 75-2 at 28), defined as "any action levied against an employee found responsible for violating University policy by the employee's supervisor and any other appropriate administrator" (*id*. at 6).[4] The 2019–2020 document lists examples of alternative resolutions for employee

---

[4] The Court notes an apparent inconsistency or ambiguity in the 2016–2017 EOIX Policies and Procedures as it relates to "corrective action." On the one hand, the definition of corrective action includes a finding of responsibility, which can only occur by means of a formal investigation. (Doc. # 75-2 at 6, 24.) However, the policies explicitly note that alternative resolutions—which by definition do not require a formal investigation (*id*. at 28)—may result in "corrective actions."

Respondents as "mandatory requirements in the form of education, coaching, mentoring, or other action steps deemed appropriate by the employee's supervisor." (Doc. # 68-4 at 25.)

Pursuant to the EOIX confidentiality provisions, "[i]nformation related to a report under these Procedures," including the parties' identities, would "only be shared with those University employees who have a 'need to know' in order to assist in the active response, review, investigation, or resolution of the report." (Doc. # 68-4 at 15); *see also* (Doc. # 74-6 at 4.) According to Mr. Enlow, faculty review committees cannot "consider [EOIX] allegations that have not been, quote/unquote substantiated." (Doc. # 74-6 at 5.) However, once a Title IX report is closed, the EOIX procedures do not strictly apply to related "educational actions taken." (*Id.* at 8.) Rather, "misconduct or inappropriate behaviors" may be considered by a faculty review committee if the committee's rules allow. (*Id.*)

## B.    ALLEGATIONS OF GENDER-BASED DISCRIMINATION AGAINST MR. SCHOTT

In August 2016, DU received reports from female students alleging that Mr. Schott and other individuals associated with the CFA (such as judges and coaches) were engaging in gender discrimination against female students. (Doc. # 68-2 at 1–2; Doc. # 68-3 at 1-2; Doc. # 79-1 at 2.) At least one student made allegations of gender-based discriminatory conduct by Mr. Schott himself. (Doc. # 68-2 at 1–2; Doc. # 68-3 at 1-2; Doc. # 74-36 at 10; Doc. # 79-1 at 2.) The student who named Mr. Schott specifically alleged that he (1) criticized her for complaining about a male trial team member's inappropriate sexual jokes, (2) asked her and other female trial team

6

members whether their husbands approved of their participation on the trial team (while male team members were not asked about their spouse's approval), and (3) provided gendered feedback including describing her advocacy as "bitchy or as hyper-aggressive." (Doc. # 68-2 at 1; Doc. # 68-3 at 1–2.) This student requested to remain anonymous, expressing fear of retaliation by Mr. Schott. (Doc. # 68-2 at 2.)

This report was forwarded to then-Director of DU's EOIX Office Jean McAllister, who also received other reports that judges and team consultant for the trial advocacy program "would give female students feedback that they were being bitchy . . . but then not describ[e] to them how they could improve," and would tell female team members that they "should paint their fingernails, have their hair up, [and would make] lots of comments about how people should dress." (Doc. # 79-1 at 2–3.) At least one complaining student articulated that Mr. Schott never called her "bitchy" but that "other coaches and volunteers . . . have used that language." (Doc. # 74-37 at 1.) In total, Ms. McAllister communicated with three students making similar complaints of gender-discriminatory behavior within the CFA. (Doc. # 79-1 at 2–3; Doc. # 74-36 at 7; Doc. # 74-37 at 1–2; Doc. # 76-3 at 1.)

Mr. Schott asserts that all the student allegations were false. (Doc. # 74 at 7 (citing Doc. # 74-8 at 1–2.)) When he first learned of the allegations, he requested an investigation and a formal conclusion. (Doc. # 74-8 at 2; Doc. # 74-23 at 3.) The students, however, did not wish to file formal complaints or to have their concerns investigated. (# 79-1 at 4.) Rather, they requested that individuals involved with the CFA be provided training and information about appropriate ways to provide feedback to

students who may face gender bias in their legal careers. (Doc. # 68-2 at 2; Doc. # 79-1 at 4.) Despite his perspective on the falsity of the allegations, Mr. Schott was initially receptive and offered ideas of changes that could be made within the CFA to address the students' concerns. (Doc. # 68-7 at 2.)

Ms. McAllister determined that, if investigated and proved accurate, the alleged behaviors would have implicated DU's EOIX policies. (Doc. # 68-5 at 2.) However, the EOIX Office did not conduct a formal investigation into any of the reports of gender-based discrimination against Mr. Schott or the CFA program more broadly. (Doc. # 74-36 at 6); *see also* (Doc. # 68-4 at 21, 25–26.) As no investigation was conducted, the EOIX Office never made a finding that Mr. Schott or anyone involved with the CFA engaged in Prohibited Conduct. (Doc. # 74-15 at 14; Doc. # 74-36 at 6.)

Ms. McAllister eventually referred the matter to the SCOL. (Doc. # 68-5 at 2; Doc. # 75-3 at 1.) In her email Ms. McAllister wrote that she was referring "the David Schott matter to you as an employee disciplinary matter." (Doc. # 75-3 at 1.) Despite using this term, Ms. McAllister testified that she "did not intend [Mr. Schott] be disciplined," but rather, that this language indicated a referral to Mr. Schott's "supervisor for action." (Doc. # 79-1 at 5.) At the time the matter was referred, SCOL Dean Bruce Smith and then-Associate Dean of Academic Affairs Viva Moffat[5] knew that the EOIX Office had not made a finding that Mr. Schott had engaged in misconduct. (Doc. # 74-16 at 5; Doc. # 74-22 at 5–6.)

---

[5] Ms. Moffat served as SCOL's Associate Dean of Academic Affairs from January 2014 through December 2018. (Doc. # 74-22 at 6.)

After consulting with University Human Resources, Mr. Smith and Ms. Moffat developed a "Statement of Expectations" ("SOE") which was presented to Mr. Schott. (Doc. # 68-6 at 1–2.) Both Mr. Smith and Ms. Moffat testified that they did not view the SOE's required tasks as an imposition of discipline on Mr. Schott. (Doc. # 68-11 at 3; Doc. #74-16 at 6.) Mr. Smith described the SOE as "an institutional compliance plan," by which the school could address the student concerns without "jump[ing] to conclusions" or passing judgment on whether the alleged conduct had occurred. (Doc. #74-16 at 6.) Ms. Moffat described the SOE as outlining "educational and constructive . . . steps the program could take to try to get at the concerns that the students had brought" as well as to "provide for the faculty, the coaches, [and] the students the information that they would need and make sure that the university's policies were clear." (Doc. # 68-11 at 3.)

The SOE outlined 5 actions that Mr. Schott, as Director, was required to implement to address the student concerns regarding gender discrimination in the CFA. (*Id.*) These actions included (1) distributing a set of Title IX training materials to faculty, coaches, and judges by January 2017; (2) drafting a set of guidelines applicable to faculty, coaches, volunteer judges, and others who provide feedback in the advocacy program; (3) scheduling a Title IX training for all faculty, coaches, and students in the CFA by February 2017; (4) scheduling a speaker during Spring 2017 to discuss gender stereotypes and biases in advocacy settings; and (5) informing current and future students in the advocacy program that they may bring concerns to, amongst others, the SCOL administration and the EOIX Office directly. (Doc. # 68-6 at 1–2.)

On the same day that Mr. Schott received the SOE in December 2016, he reached out to the EOIX Office to begin working on the required tasks. (Doc. # 75-6 at 1–2.) By the end of January 2017, Mr. Schott had developed a "Plan of Action" identifying target audiences, areas of educational focus, and steps to achieve the SOE. (Doc. # 75-7 at 1–2.) In February 2017, Interim Title IX Coordinator Eric Butler sent Mr. Schott a recorded Title IX presentation and slides for judges and coaches involved with the trial advocacy program. (Doc. # 75-1 at 8–9; Doc. # 75-10 at 3–11.) Mr. Butler testified that this presentation contained a slide titled "Guidelines for Providing Feedback." (Doc. # 75-1 at 9.)[6] Although Mr. Schott testified that he believes Mr. Butler distributed the training materials to faculty, coaches, and volunteer judges (Doc. # 74-23 at 13), it is unclear if that dissemination occurred. (Doc. # 75-15 at 1.)

During the 2017 Spring semester, Mr. Butler also presented to Mr. Schott's students on the topic of "gender equity and gender discrimination in the field of law." (Doc. # 75-1 at 6; Doc. # 74-23 at 14.) Mr. Butler did not consider this presentation to be a "Title IX training" because he does not recall discussing "specific institutional policies and procedures" which he considers to be "core elements" of Title IX trainings. (Doc. # 75-1 at 7.) Additionally, on June 29, 2017, attorney Victoria Klingensmith, Denver District Court Judge John Madden IV, and attorney Nicole Quintana participated in a panel discussion with students involved with the CFA on the topic of "the biases that

---

[6] Copies of Mr. Butler's presentation contained within the parties' evidentiary submissions do not contain a slide titled "Guidelines for Providing Feedback." (Doc. # 75-10 at 3–11; Doc. # 75-15 at 8–16.)

jurors may have toward [students] when [they] graduate and rise to the level of trial attorney."[7] (Doc. # 74-14 at 2.) Finally, Mr. Schott and Mr. Butler created a PowerPoint slide that was presented to students and explained that they could bring concerns to various resources at DU including the Dean of Students, the Title IX Office, the Office of Human Resources, and others. (Doc. # 74-23 at 15; Doc. # 75-12 at 1.)

According to Mr. Enlow, documentation from DU's EOIX Office "confirms that Professor Schott willfully engaged in a plan to address the expressed [Title IX] concerns and had completed all requirements outlined by Spring 2017. At that point in time, the University considered the matter closed and resolved." (Doc. # 75-14 at 2.)

## C.   MR. SCHOTT'S REVIEWS FOR REAPPOINTMENT

In August 2018, DU initiated the first of Mr. Schott's reviews for reappointment for a term of seven years. (Doc. # 74-15 at 6.) As Associate Dean, Ms. Moffat provided information to the 2018–2019 faculty review committee ("FRC1") on each candidate up for renewal. (Doc. # 68-11 at 5.) Regarding Mr. Schott, Ms. Moffat sent FRC1 the December 2016 SOE, as well as a memo in which she outlined various "difficulties" she experienced while working with Mr. Schott. (Doc. # 68-10 at 1.) This memo contained references to the 2016 "[c]omplaints about gendered treatment of students" which Ms. Moffat reported had come to her attention "[i]n the last five years,"—in other words, during her tenure as Associate Dean. (Doc. # 68-10 at 1–2; *see also* (Doc. # 74-22 at 14.)

---

[7] This panel discussion was originally scheduled for April 20, 2017, but was canceled that same day. (Doc. # 75-11 at 1.) Mr. Butler emailed Mr. Schott in June 2017 to follow up, but Mr. Schott did not respond. (*Id.* at 3; Doc. # 75-15 at 1.)

FCR1 requested additional information from Mr. Schott regarding the student allegations and his completion of the actions outlined in the SOE. Mr. Schott provided the following responses (in bold) to FCR1's questions:

1. Please provide the Committee with the signed Title IX training materials provided to the Program's faculty, coaches, judges, and others who provide student feedback. **The University Title IX Office directed that the Center for Advocacy should not create nor provide such "Title IX training materials" to any of the above-listed individuals, rather the management and distribution of this material to the above-listed individuals has been and should continue to be regulated by and the responsibility of the Office of the Associate Dean of Academics through its annual Adjunct Faculty Orientation.**

2. Please provide the Committee with the student feedback guidelines developed for faculty, coaches, volunteer judges, and others who provide feedback to students. **Attached is the material created by the University Title IX Office specifically to be provided to the above-listed individuals.**

3. Please provide documentation of the training session or sessions completed with the Title IX office. **Eric Butler, the then-Associate Director of the Title IX Office during the period at issue, personally delivered the training session on February 2, 2017. On January 21, 2019, I requested from Laura Maresca, the Vice Chancellor of Human Resources and Inclusive Community, any materials contained in the Title IX Office's file regarding Associate Director Butler's training session. In her response, Vice Chancellor Maresca stated the University does not have the records regarding Associate Director Butler's training session. She also stated the Title IX Office closed the matter on September 16, 2016.**

4. Please provide the name and date of the Spring 2017 speaker who addressed gender stereotypes and gender bias in advocacy settings. **Attorney Victoria Klingensmith, Denver District Court Judge John Madden IV, and attorney Nicole Quintana served on the panel on June 29, 2017 regarding the above-listed topics.**

5. Please provide documentation that students are notified that they may bring concerns directly to the administration, the University, the Office of Equal Opportunity, or the University's Title IX office. **See the attached PowerPoint slide that is shown to the National Trial Team each year.**

(Doc. # 74-7 at 1–2.)[8]

FRC1 also reached out to DU's then-Vice Chancellor of Human Resources and Inclusive Community Laura Maresca regarding Mr. Schott's compliance with the SOE. Ms. Maresca responded that, as discussed above, Mr. Butler had prepared a Title IX training for faculty, coaches, volunteer judges, and others who provide student feedback in the CFA, but that she could not "confirm whether the presentation was subsequently disseminated to the target audiences." (Doc. # 75-15 at 1.) Ms. Maresca also reported to FRC1 that she could not confirm whether the required panel discussion had occurred because Mr. Schott canceled the initial discussion and then did not respond to Mr. Butler's follow-up email. (*Id.*)

At the conclusion of Mr. Schott's review, LCR1 notified Mr. Smith that it had "[c]oncerns regarding Title IX and genderist issues" which remained "unresolved." (Doc. # 68-13 at 1–4.) In addition to the 2016 allegations of discriminatory conduct discussed above, the committee quotes three 2016 student evaluations of Mr. Schott which raise gender-related issues,[9] as well as reports of gendered treatment by colleagues, one of whom reported that Mr. Schott "entered her office, loomed over her desk and yelled at her," "impliedly told her to keep her mouth shut," and stated that "her job was to help him look good."[10] (*Id.*) FRC1 also provided Mr. Smith with Mr. Schott's above-quoted

---

[8] The copy of Mr. Schott's responses provided to the Court did not contain the referenced attachments.

[9] Mr. Schott alleges that two of these evaluations come from the same student who alleged that Mr. Schott engaged in gender-based discriminatory conduct. (Doc. # 74 at 3, 12.) However, the only evidence offered in support of this contention is Mr. Schott's affidavit. (Doc. # 74-8 at 2.)

[10] Mr. Schott asserts that this report is false. (Doc. # 74 at 3 (citing Doc. # 74-8 at 2.))

responses to its questions regarding his compliance with the SOE and with Ms. Maresca's related remarks. (*Id.*) As a result of these "unresolved" concerns, FRC1 requested that Mr. Smith "exercise [his] decanal discretion to delay [Mr. Schott's] review one year." (Doc. # 68-12 at 4.)

In April 2019, Mr. Smith shared FRC1's concerns with Mr. Schott and asked for his "thoughts as to whether it might be in [his] best interest, as a candidate, to defer [his] candidacy by one year, as permitted" by the LTCGR Rules. (*Id.* at 1–2.) Mr. Schott responded that he did not believe it was in his best interest to delay his review, asserting that "[t]here have <u>never</u> been any credible allegations of misconduct against me, the [CFA], or the attorneys and judges associated with the CFA, nor of course, any finding that I have acted unprofessionally." (Doc. # 74-10 at 1.) Mr. Schott also reached out to FRC1 directly, reiterating that he "fully and proactively oversaw and participated in the full completion of all of these public tasks [outlined in the SOE]," and inviting the committee to meet with him so that he could "provide any remaining information or clarifications" they may need. (Doc. # 75-17 at 1–2; Doc. # 75-18 at 1.) Mr. Schott noted that if a previous request to meet with the committee with his attorney present was concerning, he would be happy to meet without his attorney so long as the meeting was recorded. (Doc. # 75-17 at 2.) Despite Mr. Schott's perspective, and citing the university's interest in avoiding a negative review of its trial advocacy director, Mr. Smith ultimately decided to delay Mr. Schott's review by a year. (Doc. # 68-14 at 8.)

In October 2019, a second faculty review committee ("FRC2") commenced a review of Mr. Schott. Although she was no longer Associate Dean, Ms. Moffat sent

FRC2 the same memo about Mr. Schott as she had sent to FRC1. (Doc. # 75-19 at 1–4.) Mr. Smith provided FRC2 with the SOE as well as Mr. Schott's Plan of Action and recommended that the committee reach out to Mr. Enlow for information regarding Mr. Schott's compliance. (Doc. # 75-20 at 1–5.) FRC2 asked Mr. Enlow if he could provide information regarding

> whether Professor Schott has complied with the [SOE], whether the plan of action was acceptable as a means to satisfy the [SOE], whether any of the tasks identified on either document have been completed, [and] whether there is any ongoing oversight regarding the issues that led to these documents or the tasks identified in them[.]

(*Id.* at 1.) Mr. Enlow responded that "any prior concerns brought to [the EOIX Office] have been resolved and the matter closed. There are no currently outstanding issues with respect to the [CFA] or any professors involved in the program." (Doc. # 75-21 at 1.) It does not appear that FRC2 directly contacted Mr. Schott to seek additional information regarding the allegations of discrimination or the SOE prior to writing its draft report. (Doc. # 74-5 at 5–6; Doc. # 75-22 at 12; Doc. # 75-23 at 3.)

On June 4, 2020, FRC2 sent Mr. Schott a draft of its report. (Doc. # 75-24 at 1–18.) The committee noted that Mr. Schott "meets the criteria set forth in the Rules and is entitled to renewal of his appointment." (Doc. # 75-24 at 1.) However, the report also quoted the three student evaluations of Mr. Schott which raised gender-related issues (*id*. at 9–10), referenced reports by colleagues which alleged gendered treatment (*id*. at 14), and contained a section titled "Title IX Considerations" which discussed the information contained in Ms. Moffat's memo, the 2016 SOE's requirements, and directly quoted the responses Mr. Schott and Ms. Maresca provided to FRC1 regarding the

extent to which Mr. Schott completed the SOE (*id.* at 14–16). At the conclusion of this section, FRC2 stated

> [t]he Committee continues to lack information regarding what, if any, requirements identified in the December 2016 [SOE] or January 2017 Plan of Action have been completed. Moreover, the Committee has been unable to gather any information regarding what, if any, measures Professor Schott has taken to remedy potential Title IX violations within the Program.

(*Id.* at 16.)

Following his receipt of FRC2's draft report, Mr. Schott reached out to Mr. Enlow and requested that his office intervene to prevent the report's publication to faculty, asserting that disclosure of the report's "Title IX Considerations" violated EOIX's confidentiality policies. (Doc. # 75-28 at 1.) Mr. Schott also reached out directly to FRC2 with these concerns and reminded the committee that "there has never been a finding that [he] violated any University policy relating to Title IX or equal opportunity." (Doc. # 75-29 at 3–5); *see also* (Doc. # 74-15 at 14.) Despite Mr. Schott's concerns, FRC2's full report, including the "Title IX Considerations" was published to SCOL faculty on June 19, 2020. (Doc. # 75-30 at 1.)

In response to publication of FRC2's report on Mr. Schott, Ms. Moffat emailed interim Chair of the committee César Cuauhtémoc Garcia Hernández with comments. (Doc. # 75-31 at 1.) In this email Ms. Moffat stated that "it appears that [Mr. Schott] made no effort to demonstrate that he satisfied the requirements set forth in the [SOE] and the Plan of Action." (*Id.*) Mr. Hernández forwarded FRC2's report and faculty comments, including those by Ms. Moffat, to Mr. Smith on July 1, 2020. (Doc. # 75-32 at 1.)

Mr. Schott has not been reappointed to a seven-year term although he continues to be employed as professor of the Practice of Law and Director of the CFA. (Doc. # 68-9 at 22; Doc. # 74-8 at 2–3.) The University asserts that its reasons for not renewing Mr. Schott's long-term contract include: (1) the student allegations regarding discriminatory treatment based on gender by Mr. Schott and others involved with the CFA, (2) comments in course evaluations alleging Mr. Schott is misogynistic and unprofessional, (3) concerns about Mr. Schott's "interactions with faculty colleagues, including . . . one or more Associate Deans of Academic Affairs," (4) concerns regarding Mr. Schott's compliance with the SOE, (5) concerns regarding Mr. Schott's coordination with the Associate Dean over the hiring and compensation of adjunct faculty including Mr. Schott's alleged resistance to efforts to diversify adjunct faculty, (6) concerns regarding Mr. Schott's compliance with COVID policies,[11] and (7) Mr. Schott's alleged refusal to meet with Mr. Smith to discuss these concerns. (Doc. # 68-9 at 4; Doc. # 68-14 at 2; Doc. # 74-16 at 3; Doc. # 75-34 at 8.)

Mr. Schott alleges that because of DU's mishandling of the Title IX allegations against him and the decision not to renew his teaching contract he has suffered reputational harm and emotional distress. (Doc. # 74-8 at 3.) Mr. Schott testified that the benefits of having a seven year contract are "[j]ob security [and p]eace of mind." (Doc. # 68-9 at 22.) However, Mr. Schott acknowledged that he has not sought medical

---

[11] Mr. Schott alleges that this cannot be a rationale for nonrenewal because "the only instance in which I am alleged to have violated DU's Covid policies occurred in spring 2021, several months after my teaching contract" was not renewed. (Doc. # 74-8 at 3.) Mr. Schott also denies that he violated any Covid policies. (*Id.*)

treatment, has not been fired, his pay has not been reduced, and he has received merit raises from the university in the years following the 2016 allegations and his contract nonrenewal. (Doc. # 68-9 at 14; Doc. # 68-14 at 6; Doc. # 75-38 at 1; Doc. # 75-40 at 1; Doc. # 75-41 at 1.)

D.    **MR. SCHOTT'S ALLEGATIONS OF GENDER-BASED DISCRIMINATION AGAINST THE UNIVERSITY**

During the summer of 2016, Ms. Moffat and Mr. Schott met regarding adjunct faculty in the CFA. Mr. Schott alleges that during this meeting Ms. Moffat told him she did "not want to see white men teaching anymore in the [CFA]," and rather Mr. Schott should hire only "minority women, preferably African American women." (Doc. # 74-23 at 4.) Defendants dispute that Ms. Moffat made the remark as described, and rather assert that during this meeting she asked Mr. Schott to work on "recruiting a more diverse pool of adjunct faculty." (Doc. # 74-24 at 1.) Mr. Schott alleges that he reported this comment to Mr. Smith, but no action was taken. (Doc. # 74-8 at 1.) As a result of Ms. Moffat's "directive," Mr. Schott alleges that he reduced his own teaching load, "thereby significantly reducing [his] annual compensation."[12] (Doc. # 74-8 at 1.)

In April 2020, Mr. Schott referenced this alleged comment when he reached out to DU's EOIX Office regarding "the racist and gender discriminatory statements that [Ms. Moffat] made on behalf of the Administration, and the unlawful employment practices in which she engaged." (Doc. # 68-16 at 1.) Then-Title IX Coordinator Mr.

---

[12] Defendants dispute this allegation, asserting that Mr. Schott has "not sought to increase his teaching load and 'can't say one way or the other' whether he could do so." (Doc. # 79 at 1 (quoting Doc. # 68-9 at 27.))

Enlow testified that he treated Mr. Schott's allegations as a Title IX report, but that because Mr. Schott "provided no information to suggest that—that threat was acted upon or influenced or there was any tangible action that had resulted from that statement," he concluded the comment was an isolated one which did not meet DU's definition of discrimination or harassment. (Doc. # 68-17 at 3–4.)

On July 3, 2020, Mr. Schott again reached out to Mr. Enlow's office asserting that publication of FRC2's report was part of a "continuum of adverse . . . actions" against him that began with Ms. Moffat's unlawful "white men" directive in 2016. (Doc. # 74-18 at 2.) It is unclear what if any actions were taken as a result of this communication.

## E.    RELEVANT PROCEDURAL HISTORY

In his Amended Complaint, Mr. Schott asserts 12 claims including discrimination and retaliation under Title IX; violation of the Colorado Wage Claim Act ("CWCA"); breach of contract; promissory estoppel; unequal pay in violation of the Colorado Equal Pay for Equal Work Act ("EPEWA"); gross negligence relating to DU's Title IX policies and procedures; tortious interference; and defamation *per se*. (Doc. # 48.) On June 23, 2023, Defendants moved for summary judgment on all of Mr. Schott's claims. (Doc. # 68.) Mr. Schott filed his Response on July 28, 2023 (Doc. # 74), and Defendants filed their Reply on August 11, 2023 (Doc. # 79).

On August 18, 2023, Mr. Schott filed a Motion to Strike portions of Defendants' Reply on the basis that the Reply improperly raised new arguments. (Doc. # 80.) In the alternative, Mr. Schott requested leave to file a sur-reply. (*Id.*) The Court granted Mr. Schott's motion in part, permitting him to file a brief sur-reply addressing only the matter

of whether and when Mr. Smith was aware of his July 3, 2020 discrimination complaint.
(Doc. # 90 at 4–5, 7.) Mr. Schott's Motion to Strike was denied in all other respects. (*Id.*
at 5–7.) Mr. Schott filed his Sur-Reply on September 22, 2023. (Doc. # 91.)

## II.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper
disposition of the claim under the relevant substantive law. *Wright v. Abbot Labs., Inc.*,
259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such
that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v.
Muskogee, Okl.*, 118 F.3d 837, 839 (10th Cir. 1997). When reviewing motions for
summary judgment, a court may not resolve issues of credibility, and must view the
evidence in the light most favorable to the nonmoving party—including all reasonable
inferences from that evidence. *Id*. However, conclusory statements based merely on
conjecture, speculation, or subjective belief do not constitute competent summary
judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating an absence of a
genuine dispute of material fact and entitlement to judgment as a matter of law. *Id*. In
attempting to meet this standard, a movant who does not bear the ultimate burden of
persuasion at trial does not need to disprove the other party's claims; rather, the movant
need simply point the court to a lack of evidence for the other party on an essential

element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 644, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant meets its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy this burden. *Id*. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence from which a rational trier of fact could find for the nonmoving party." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id*. Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

### III.   DISCUSSION

The heart of this case revolves around Mr. Schott's claims that DU discriminated and retaliated against him in violation of Title IX of the Education Amendments Act of 1972. (Doc. # 48 at 158–65.) Title IX prohibits discrimination "on the basis of sex" in educational programs or activities receiving federal funding. 20 U.S.C. § 1681(a). This includes employment discrimination and retaliation in federally funded educational programs such as DU. *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017). Under the *McDonnell Douglas* framework employed in the Tenth Circuit when assessing a motion for summary judgment on Title IX claims, the plaintiff has the initial burden of

presenting a prima facie case of discrimination. *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221 (10th Cir. 2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Upon such a showing, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Id*. Summary judgment will be granted if the plaintiff cannot establish the employer's articulated reasons are pretextual. *Id*.

Mr. Schott alleges that DU discriminated against him on the basis of sex by (1) failing to reappoint him to a long-term contract on the basis of allegations of gender discriminatory conduct towards students and colleagues, (2) failing to follow DU's Title IX policies and procedures with respect to the allegations against him, and (3) failing to investigate Mr. Schott's November 15, 2019, and July 3, 2020, complaints of discriminatory treatment. (Doc. # 48 at 158–61.) Mr. Schott also alleges that DU retaliated against him by "failing to reappoint him to a seven-year term, even though such reappointment was mandated by DU's policies and [his] contract" following the 2019 and 2020 Title IX complaints he made against SCOL administration. (*Id*. at 162–65.)

## A.    RELEVANT LAW

Both claims of discrimination and retaliation in violation of Title IX require a plaintiff to establish that he suffered an adverse employment action. *Hiatt*, 858 F.3d at 1316. As the United States Court of Appeals for the Tenth Circuit has explained:

> For discrimination claims, "[a]n adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 635 (10th Cir. 2012) (emphasis and quotations omitted). "[A] mere inconvenience or an alteration of job responsibilities" does not

> qualify as an adverse action. *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (quotations omitted).
>
> For retaliation claims, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L.Ed.2d 345 (2006) (quotations omitted). The action must be materially adverse "to separate significant from trivial harms," such as "petty slights, minor annoyances, and simple lack of good manners . . . ." *Id.*

*Hiatt*, 858 F.3d at 1316. Both standards are construed broadly and require the Court to consider the unique context and factors relevant to circumstances present in each case. *Burlington N.*, 548 U.S. at 69 (retaliation); *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1040 (10th Cir. 2011) (discrimination).

"The adversity standard for a Title [IX] discrimination claim is more stringent than for a retaliation claim."[13] *Williams v. Aeroflex Wichita, Inc.*, No. 20-3230, 2023 WL 2395994, at *5 (10th Cir. Mar. 8, 2023) (citing *Piercy*, 480 F.3d at 1203 n.12). Yet, Title IX does not protect individuals "from all retaliation but only from retaliation that produces an injury or harm that itself rises to a level of seriousness." *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1216 (10th Cir. 2010) (internal quotation marks omitted) (quoting *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1087 (10th Cir. 2007)). Accordingly, if Mr. Schott does not establish that he experienced a "materially adverse" employment action pursuant to the *Burlington Northern* standard, both of his Title IX claims fail.

---

[13] "Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims." *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001) (citing *Roberts v. Colorado State Bd. of Agric.*, 998 F.2d 824, 832 (10th Cir.1993) (Title VII is "the most appropriate analogue when defining Title IX's substantive standards")).

Heightened scrutiny or criticism of an individual's work performance or placement of an employee on a performance improvement plan may constitute a materially adverse employment action under *Burlington Northern* if "it effects a significant change in the plaintiff's employment status," such as placing the employee in an "at-risk status." *Williams*, 2023 WL 2395994, at *4 (quoting *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1226 (10th Cir. 2022)); *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1224–25 (10th Cir. 2006); *see also Payan v. United Parcel Service*, 905 F.3d 1162, 1174 (10th Cir. 2018) (concluding that "placement on an employee improvement plan alone does not qualify as a materially adverse action as defined by *Burlington Northern*.").

## B.   APPLICATION

Mr. Schott asserts that DU's decision not to reappoint him to a seven-year term constitutes an adverse employment action sufficient to demonstrate both retaliation and discrimination under Title IX because that decision "altered [his] status from a long-term contract faculty member, with all procedural and substantive rights that entails, to an at-will employee, with no entitlement to periodic contract reviews, no presumption in favor of renewal, and the ability to be terminated at any time for any reason." (Doc. # 74 at 17); *see also* (Doc. # 48 at ¶¶ 162–65.)

The Court disagrees. Mr. Schott has not experienced a "significant change in employment status" or a "materially adverse" action sufficient to "dissuade[] a reasonable worker from making" a discrimination claim as required to establish prima facie claims for Title IX discrimination and retaliation respectively. *Hiatt*, 858 F.3d at 1316. As an initial matter, the Court notes that FRC1's request that Mr. Smith delay Mr.

Schott's review for a year occurred in the Spring of 2019. (Doc. # 68-12 at 1, 4.) Mr. Smith acted in accordance with this suggestion sometime that summer or early Fall. Mr. Schott's earliest complaint of discrimination was made on November 15, 2019,[14] followed by additional complaints in April and July 2020. (Doc. # 68-16 at 1; Doc. # 74-18 at 2.) Accordingly, delay and nonrenewal of Mr. Schott's long-term contract did not dissuade him from making or maintaining a charge of discrimination, as the first occurrences of these actions preceded all of Mr. Schott's complaints of discriminatory conduct. *See Ford*, 45 F.4th at 1227 (determining that because the alleged adverse action occurred before plaintiff's protected activity, she could not maintain her retaliation claim on that basis); *Payan*, 905 F.3d at 1174 (citing favorably to *Jackson v. Honeywell Int'l, Inc.*, 601 F. App'x 280, 286 (5th Cir. 2015), which noted that a plaintiff's continued engagement in a protected activity was evidence that he had not been dissuaded from reporting alleged violations).

Further, Mr. Schott does not dispute that he remains employed at SCOL in the same position, with the same titles—professor of the Practice of Law and Director of the CFA—since 2013. (Doc. # 68-9 at 22; Doc. # 74-8 at 2–3.) It is also undisputed that Mr. Schott's salary has not decreased, and he has received merit salary increases during his continued employment. (Doc. # 68-14 at 6–7; Doc. # 75-38 at 1; Doc. # 75-40 at 1; Doc. # 75-41 at 1.) Although the Court recognizes that a long-term contract would provide Mr. Schott with "[j]ob security [and p]eace of mind" (Doc. # 68-9 at 22), the loss

---

[14] Although both parties reference the November 2019 complaint (Doc. # 48 at ¶¶ 98, 103, 105, 112, 159; Doc. # 68 at 9, 18), neither party has provided direct evidence of this report.

of these intangible benefits, without more, is insufficient to constitute an adverse employment action under *Burlington Northern*. 548 U.S. at 68–69.

Finally, Mr. Schott alleges that he has lost various benefits afforded to DU faculty with long-term contracts, yet, he has not pointed to evidence of these losses. Although neither party has addressed the extent to which the LTCGR Rules or the APT apply to faculty members employed at-will or for a one-year term, the language of these documents appear to extend their benefits and protections based on title or "function," not contract length. For example, the LTCGR rules state that their protections apply to "non-tenure-line faculty serving an appointment for work that is primarily teaching and not primarily administrative, in a function for which the faculty has authorized LTCGR status." (Doc. # 68-8 at 1.) Additionally, although Mr. Schott asserts that he has lost the presumption in favor of renewal, the rule states that "Full Professors"—which Mr. Schott continues to be—"are entitled to a presumption favoring renewal of the appointment at the same rank." (*Id.* at 3.) Similarly, the APT appears to establish rules for reappointment and protections from termination based on a faculty member's title rather than the length of their contract. (Doc. # 74-3 at 19–23, 45–46.)

Mr. Shott's title and job responsibilities have not changed since 2013. (Doc. # 68-9 at 22; Doc. # 74-8 at 2–3.) Accordingly, it appears these documents may still apply to him. Either way, because Mr. Schott is the plaintiff in this action, it is his burden to demonstrate actual loss of benefits sufficient to dissuade "a reasonable worker from making or supporting a charge of discrimination" or amounting to a "significant change in employment status." *Hiatt*, 858 F.3d at 1316. By failing to address the extent to which

the LTCGR rules of the APT apply, or not, to his current employment status, or to point to relevant evidence, he has failed to do so here.

As Mr. Schott has failed to point to admissible facts which would allow a reasonable jury to find that he suffered an adverse employment action, DU is entitled to summary judgment on Mr. Schott's Title IX claims in their entirety. *Adler*, 144 F.3d at 671.

Upon the entry of judgment in favor of DU on Mr. Schott's Title IX claims, this Court loses its original subject-matter jurisdiction. The Court declines to exercise supplemental jurisdiction over Mr. Schott's remaining claims, all of which arise under state law. 28 U.S.C. § 1367(c)(3); *Lucero v. Gordon*, 786 F. App'x 833, 836–37 (10th Cir. 2019) (explaining that the Court may—"and usually should"—decline to exercise supplemental jurisdiction once it has resolved all claims over which it has original jurisdiction). Accordingly, the Court dismisses Mr. Schott's ten state law claims, without prejudice, for lack of subject-matter jurisdiction.

## IV.    CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

- Defendants' Motion for Summary Judgment (# 68) is GRANTED IN PART. The Court grants summary judgment to Defendant University of Denver on Plaintiff David Schott's Title IX claims against it, and the Clerk of the Court shall enter judgment in favor of the University of Denver on those claims.

- The Court DISMISSES, without prejudice, Mr. Schott's remaining claims for lack of subject-matter jurisdiction.

- The Final Trial Preparation Conference set for May 2, 2024 and Jury Trial set to commence on May 13, 2024 are VACATED.

  The Clerk is directed to close this case.

  DATED: January 4, 2024

  BY THE COURT:

  CHRISTINE M. ARGUELLO
  Senior United States District Judge